UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------- x
UNITED STATES OF AMERICA           :
                                   :
                                   :
            -v-                    :          19-cr-774 (JSR)
                                   :
ROGER RALSTON et al.,              :          MEMORANDUM ORDER
                                   :
            Defendants.            :
--------------------------------- x

JED S. RAKOFF, U.S.D.J.

        Defendants Roger Ralston, Christopher Wright, and Steven
Hooper are charged in connection with an alleged scheme to defraud
victims in the United Kingdom through the sale of false,
fraudulent, and materially misleading investments, and to launder
the proceeds through bank accounts in the U.S. Specifically, they
are charged in a second superseding indictment with conspiracy to
commit wire fraud and bank fraud, substantive wire fraud,
conspiracy to commit money laundering, and, as to Ralston and
Wright only, illegal monetary transactions. See ECF No. 186. On
January 21, 2022, the defendants filed various pretrial motions.
ECF Nos. 190, 191. After briefing and hearing oral argument, the
Court, by bottom-line order dated March 4, 2022, denied the motions
on various grounds. ECF No. 198. This Memorandum Order sets forth
the reasons for those rulings.

**BACKGROUND**

Unless otherwise indicated, the following factual allegations are taken from the S2 Superseding Indictment, ECF No. 186, or the Bill of Particulars, ECF No. 36.

The defendants are charged in a second superseding indictment with conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1349, 2326(1), and 2326(2) (Count One); wire fraud, in violation of 18 U.S.C. §§ 1343, 2, 2326(1), and 2326(2) (Count Two); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Three); and, as to Ralston and Wright only, illegal monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2 (Counts Four and Five, respectively). See ECF No. 186.

Investment Fraud Scheme

The S2 Indictment alleges that from approximately 2009 to 2015, Ralston, Wright, Hooper, and others engaged in an investment fraud scheme that involved making materially false, fraudulent, and misleading representations about purported investment opportunities in the U.S., and laundering the proceeds through bank accounts in the U.S. and foreign countries.

Starting in or about 2009, Ralston, Wright, and others engaged in a fraudulent scheme that involved selling shares in DirectView Holdings, Inc., a Florida corporation of which Ralston was the CEO

(the "Stock Fraud"). Then, from approximately 2011 to 2015, Hooper joined Ralston and Wright to sell fictitious carbon credits (the "Carbon Credit Fraud").

The defendants used telemarketing call centers, or "boiler rooms," to identify and cold-call potential victims, many of whom were elderly and retired people in the U.K. Wright and Hooper provided the telemarketing salesroom expertise and connections to set up and run the boiler rooms. The telemarketers persuaded victims to invest money in DirectView stock and carbon credits at significantly inflated prices based on false and misleading representations, including that the purported investments would yield short-term, high-yield, no-risk returns -- when in fact, the DirectView stock was high-risk and illiquid, and the carbon credits were entirely fictitious. The telemarketers also concealed that a significant portion of the purported investments would be used to pay "commissions" to members of the scheme. Victims were also frequently told, falsely, that they needed to invest more to be able to liquidate their holdings.

Ralston, with the knowledge and participation of Wright and Hooper, set up multiple U.S.-based shell companies and opened a number of bank accounts to receive funds from victims. Ralston also mailed purchase agreements and investment certificates to victims in the U.K. When Ralston received victims' funds, he

laundered a significant portion of the proceeds through bank accounts in the name of shell companies controlled by Wright, Hooper, and others in Cyprus, the U.K., and Switzerland.

Bank Fraud Conspiracy

As part of the Carbon Credit Fraud, the defendants and others led victims to believe that they were investing in legitimate U.S. companies with U.S. bank accounts. Banks repeatedly froze the defendants' accounts or refused to process wires because of, inter alia, anti-money laundering inquiries, victim complaints, recalls of funds, and U.K. consumer warnings. In part because of this problem, the defendants established multiple U.S. shell companies and opened a number of bank accounts in the U.S. as other accounts were closed or frozen. In order to open accounts and obtain funds in the accounts after they had been restrained by the banks, the defendants conspired to lie to U.S. banks about the nature of their business and the source of the funds.

The Government asserts that it expects emails and witness testimony to show that in October 2012, Ralston's U.S.-based Citibank account (in the name of shell company Lonestar Regal Capital, or LSRC) was frozen as the bank began an investigation. At the time, the account contained several hundred thousand dollars in fraud proceeds. In order to persuade Citibank to lift the freeze, the defendants created a set of false and misleading

informational materials about LSRC to provide to Citibank -- materials that falsely presented LSRC as a legitimate consulting company that helped individuals and businesses to offset their carbon footprints, rather than a shell company solely set up to receive proceeds from the Carbon Credit Fraud. The materials contained a number of false and misleading statements about the nature of LSRC's business. Ralston provided the false and misleading documents, created with the help of Wright and Hooper, to Citibank, and Ralston was eventually allowed to withdraw the funds from the account.

As a result of the problems with Citibank, the defendants created a new shell company and opened new accounts at other banks. According to the Government, emails show that the defendants later prepared the same or similar false and misleading materials to provide to other U.S. banks, including TD Bank and Sovereign Bank, for accounts in the name of the shell entity Manhattan Sky. The defendants also created invoices and agreements, including backdated contracts, to respond to bank inquiries and provide backup documentation for international wires.

Conduct in 2014

Some of the defense motions concern whether one or more of the charges are time-barred. The defendants' actions in 2014 are

particularly relevant to this issue.[1] The S2 Superseding Indictment and Bill of Particulars allege that Wright and Hooper controlled a U.K. bank account in the name of CO2 Commodities Ltd. at Barclays Bank, which they used to receive fraud proceeds from Ralston. In December 2013, Barclays froze the CO2 Commodities account as well as Wright's and Hooper's associated personal accounts, which had regularly received transfers of fraud proceeds from the CO2 Commodities account. From December 2013 into January 2014, Hooper provided Ralston with materials, such as templates for carbon credits and purchase contracts, to continue to commit the Carbon Credit Fraud. On or about January 22, 2014, Wright and Hooper self-surrendered to law enforcement in the U.K. in connection with the U.K. investigation into the Carbon Credit Fraud. Before his interview, Hooper deleted evidence of the scheme from his Blackberry. During the interview, Wright and Hooper gave "no comment" responses to questions.

---

[1]   In 2016, the U.S. Attorney's Office for the Southern District of New York began investigating Ralston for fraud, money laundering, and criminal tax offenses. As part of this investigation, on June 25, 2019, the Government issued a mutual legal assistance treaty (MLAT) request to Cyprus; on June 27, 2019, Judge Carter signed an order tolling the statute of limitations pursuant to 18 U.S.C. § 3292 based on the pendency of that MLAT. As a result of the tolling order, the running of the statute of limitations was tolled beginning on June 25, 2014.

Ralston and others running the boiler rooms continued to defraud victims through the end of 2014; evidence shows that the co-conspirators continued to launder fraud proceeds until in or about May 2015. After their arrest in the U.K., Wright and Hooper stopped participating in the quotidian business of the Carbon Credit Fraud, but continued to receive, transfer, and make efforts to obtain fraud proceeds. On or about February 2, 2014, Hooper faxed Ralston with details for an account in the name of WHI Safeguard Inc., an entity controlled by Wright and Hooper. On or about March 13, 2014, Wright and Hooper received a $25,000 transfer of fraud proceeds from Ralston. In late June and July 2014, Wright made transfers of fraud proceeds between two shell company accounts in the name of Corduff Ltd. that he controlled.

In early June 2014, Wright and Hooper engaged a liquidator to wind down CO2 Commodities so that Wright and Hooper could access and liquidate its assets (including the frozen fraud proceeds). From June through August 2014, the liquidator, who was in frequent contact with Wright and Hooper, worked on their behalf to un-freeze the funds at Barclays. Barclays declined to release the funds unless it received certain information about CO2 Commodities. In July 2014, Hooper emailed to the liquidator false and misleading responses to the Barclays inquiries for the liquidator to provide to Barclays; the liquidator passed the

information on to Barclays. On or about August 12, 2014, Barclays released the funds in the CO2 Commodities account as well as in Wright's and Hooper's personal accounts. The funds in the CO2 Commodities account were transferred to the liquidator, who then used them to pay taxes and debts related to CO2 Commodities. When the freeze was lifted, Wright and Hooper transferred thousands of dollars, allegedly of fraud proceeds, out of their personal accounts at Barclays to other accounts under their control.

Procedural Background

On October 29, 2019, a grand jury returned a seven-count superseding indictment charging Ralston, Wright, and Hooper with conspiracy to commit mail and wire fraud, mail fraud, wire fraud, conspiracy to commit money laundering, money laundering (concealment), money laundering (international concealment), and illegal monetary transactions. Ralston was arrested in Florida on November 20, 2019. Wright was arrested on January 27, 2021 in Spain and consented to extradition to the U.S. Hooper was arrested on January 28, 2021 in the U.K. and consented to extradition to the U.S.

In August 2021, Wright and Ralston filed pretrial motions, including a request for a bill of particulars detailing all conduct within the limitations period, which was granted by Judge Furman, who ordered the Government to file a bill of particulars

identifying with particularity the defendants' alleged conduct after June 27, 2014. The Government filed its Bill of Particulars on November 22, 2021. ECF No. 36.

The undersigned accepted reassignment of this case from Judge Furman on December 3, 2021. On January 5, 2021, a grand jury returned a five-count second superseding indictment, which added a bank fraud object to the conspiracy charged in Count One and dropped the mail fraud object, dropped the substantive mail fraud and substantive Section 1956 money laundering charges as to all three defendants, dropped the Section 1957 money laundering charge against Hooper, and narrowed the time frames for the Section 1957 charges against Ralston and Wright. ECF No. 186. The defendants were arraigned on the S2 Indictment on January 13, 2022.

## DISCUSSION

Grouped by issue, the Court addresses the eight motions in turn: (I) Ralston's, Wright's, and Hooper's motions to dismiss the bank fraud conspiracy object of Count One for failure to state an offense; (II) Wright's and Hooper's motions to dismiss the bank fraud conspiracy object of Count One on specialty grounds; (III) Wright's and Hooper's motions to dismiss the substantive wire fraud claim, Count Two; (IV) Hooper's motion to dismiss Counts One and Three on the ground that Hooper withdrew from the charged

conspiracies before the applicable statute of limitations period; (V) Hooper's motion to dismiss Count One as duplicitous because it joins two separate conspiracies into one continuous scheme; (VI) Wright's and Ralston's motions for severance; (VII) Hooper's motion for a supplemental bill of particulars; and (VIII) Ralston's motion to find the Government's 404(b) notice insufficient.

## I. Motion to Dismiss the Bank Fraud Conspiracy Object of Count One for Failure to State an Offense

As set out in the Court's bottom-line order dated March 4, 2022, the Court denied without prejudice Ralston's, Wright's, and Hooper's motions to dismiss the bank fraud conspiracy object of Count One of the S2 Superseding Indictment for failure to state an offense. At oral argument, counsel for all three defendants indicated that, given the information provided in the Government's submission, they were withdrawing this motion for the time being.

## II. Motion to Dismiss the Bank Fraud Conspiracy Object of Count One on Specialty Grounds

As set out in the Court's bottom-line order dated March 4, 2022, the Court denied without prejudice Wright's and Hooper's motions to dismiss the bank fraud conspiracy object of Count One on specialty grounds. Even assuming that either defendant has standing to raise this challenge, counsel for both Wright and

Hooper agreed at oral argument that the decision of the extraditing countries as to waiver of the rule of specialty will be dispositive. The Government is directed to keep the Court and the parties informed regarding the status of the requested waivers.

### III.    Motion to Dismiss Count Two

Wright and Hooper both move to dismiss Count Two, substantive wire fraud, for failure to state an offense. Wright argues that because the Government does not allege at least one specific wire in furtherance of the scheme to defraud that falls within the statute of limitations, the substantive wire fraud count should be dismissed. Hooper, in turn, argues that Count Two can only stand if Hooper himself committed a substantive act of wire fraud on or after June 25, 2014, and asserts that Hooper took no action in furtherance of the alleged wire fraud after February 2014.

The Government's arguments in response are threefold: (1) that the indictment's allegations of an approximate timeframe for an ongoing wire fraud scheme that continued into the limitations period are sufficient to survive a Rule 12(b) motion to dismiss the indictment; (2) that there are specific wires made by Wright (though not Hooper) that are in furtherance of the scheme to defraud and fall within the limitations period; and (3) that there is, in fact, no requirement that Wright or Hooper themselves

-11-

make a wire within the limitations period because they are liable for the wires Ralston made during the statutory period.

First, the Government argues that the motion should be denied as to both Wright and Hooper because the indictment's allegations of an approximate timeframe for an ongoing wire fraud scheme that continued into the limitations period are sufficient to survive a Rule 12(b) motion to dismiss the indictment. See United States v. Jaswal, 47 F.3d 539, 542–43 (2d Cir. 1995) (per curiam) (holding that despite failing to include the year the offense was committed, indictment was not defective); see also United States v. Schutzman, 225 F.3d 647, 647 (2d Cir. 2000) (summary order) (affirming denial of motion to dismiss mail and wire fraud charges for being time-barred because indictment "stated the time in approximate terms").[2] The Court need not decide whether this is sufficient to survive the instant motion, however, because the Government alleges specific wires made by Wright that fall within the limitations period that would support a substantive wire fraud charge. Furthermore, as to both Wright and Hooper, the substantive wire fraud charge is supported by allegations of wires made by Ralston during the limitations period because Wright and Hooper acted to

---

[2]     Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

provide Ralston with materials to continue the scheme with knowledge that the use of wires would follow in the ordinary course of business or that such use could reasonably have been foreseen.

As for specific wires made by Wright within the limitations period, Wright argues, based on allegations in the Bill of Particulars, that the Government does not allege at least one specific wire in furtherance of the scheme to defraud that falls within the statute of limitations. ECF No. 192 at 23-25. But the Government does, in fact, allege that Wright committed acts of wire fraud within the limitations period: both in international wire transfers of fraud proceeds between his two Corduff Ltd. accounts on June 27 and July 30, 2014, and in international emails and telephone calls between Wright (in the U.K.) and Ralston (in the U.S.) during the limitations period. The Bill of Particulars sets forth that Wright made wire transfers of alleged fraud proceeds between foreign bank accounts (traveling through a correspondent bank account in New York City) on June 27, 2014 and July 30, 2014. See ECF No. 36 ¶¶ 11(b)(i)-(ii). Wright's alleged transfers of fraud proceeds between two shell company accounts he controlled furthered his conversion of the proceeds to his own use and are therefore substantive acts of wire fraud as part of the scheme. See United States v. Vilar, 729 F.3d 62, 95 (2d Cir. 2013) (finding substantive wire fraud offense is still ongoing when a

defendant uses the wires to convert the money to his own use, including transferring funds between two accounts controlled by participants in the wire fraud scheme).

Wright's arguments that these wires are insufficient because they relate to the money laundering counts, not wire fraud counts, is unpersuasive. Even though the allegations reference the already-obtained fraud proceeds being moved between foreign bank accounts, Wright's contention that the same wire transfer cannot be both the "specified unlawful activity" and "monetary transaction in criminally derived property" in a money laundering charge is not accurate. The June and July 2014 transfers could constitute both substantive acts of wire fraud and acts in furtherance of the money laundering conspiracy where phases of the fraud scheme were allegedly completed when Ralston received the victim funds in his U.S. accounts and wired those fraud proceeds to Wright's account in Cyprus, before Wright then transferred those funds to his account in St. Vincent. See United States v. Szur, 289 F.3d 200, 214 (2d Cir. 2002) (finding that same transfer of funds can be both part of a scheme to defraud and constitute money laundering when the money laundering occurs after "a completed phase of an ongoing offense" that generated proceeds).

The Bill of Particulars also sets forth emails and telephone calls between Wright and Ralston during the limitations period.

See ECF No. 36 ¶¶ 11(d), 11(e), 11(i). Wright argues that the Government did not specify that these wires were international and that they are "of a completely different variety" than the wires charged in Count Two. The Government asserts that it expects to show at trial that the emails and phone calls cited in the Bill of Particulars were international wires between Ralston, who was based in the United States, and Wright, who was based in the U.K., in furtherance of obtaining fraud proceeds. The Government is not required to describe with specificity which particular wires satisfy the jurisdictional element of wire fraud. See, e.g., United States v. D'Amelio, 683 F.3d 412, 421-23 (2d Cir. 2012) (concluding that "the essential elements of the wire fraud crime involved wire transfers, not specific wire transfers").

Furthermore, both Wright and Hooper can be liable for wires that Ralston made during the statutory period because they are alleged to have acted to provide Ralston with materials to continue the scheme with knowledge that the use of wires would follow in the ordinary course of business or that such use could reasonably have been foreseen. See United States v. Kim, 246 F.3d 186, 190 (2d Cir. 2001) (holding that a defendant "causes" a wire transmission under Section 1343 when he acts "with knowledge that the use of the wires would follow in the ordinary course of business, or if such use could reasonably have been foreseen").

-15-

Alternatively, Wright and Hooper are charged with aiding and abetting wire fraud pursuant to 18 U.S.C. § 2, and thus they could be liable even if not as principals. United States v. Erb, 543 F.2d 438, 446 (2d Cir. 1976) (rejecting argument that defendant's actions taken before limitations period could not render defendant liable for aiding and abetting filing of a false statement because the "period of limitation began to run only when the crime was complete").

Because the allegations include specific wires made by Wright within the limitations period that would support a substantive wire fraud charge and because both defendants aided Ralston by providing him with materials to carry on the scheme in Hooper's absence when it was foreseeable to both Wright and Hooper that Ralston would continue to send wires in the ordinary course of the scheme, Count Two states an offense as to both defendants. Accordingly, and as set out in the Court's bottom-line order, Wright's and Hooper's motions to dismiss the substantive wire fraud claim, Count Two of the S2 Superseding Indictment are denied.

## IV.  Motion to Dismiss Counts One and Three

Hooper moves to dismiss Counts One and Three on the ground that he withdrew from the relevant conspiracies before the applicable statute of limitations period. The statute of

limitations begins to run when an alleged conspirator withdraws from the conspiracy, and withdrawal outside the relevant statute of limitations period is a complete defense to prosecution. See Smith v. United States, 568 U.S. 106, 107 (2013); United States v. Salerno, 868 F.2d 524, 534 (2d Cir. 1989). Withdrawal is an affirmative defense that a defendant must establish by a preponderance of the evidence. See Smith, 568 U.S. at 112.

To establish withdrawal from a conspiracy, a defendant must take some sort of affirmative action, either "making [] a clean breast to the authorities, or communicat[ing] [] the abandonment in a manner reasonably calculated to reach co-conspirators." United States v. Berger, 224 F.3d 107, 118 (2d Cir. 2000). A defendant must also show that after he withdrew, he did not take any acts to promote the conspiracy and did not receive any further benefits from the conspiracy. See id. When the purpose of a conspiracy is economic profit, the "scheme continues through conspirators' receipt of their anticipated economic benefits," and if a member of the conspiracy "knowingly receives a share of the scheme's anticipated proceeds," including by passively holding out his account, that conspirator engages in an overt act in furtherance of the conspiracy. United States v. Salmonese, 352 F.3d 608, 611, 615 (2d Cir. 2003).

Hooper argues that he withdrew from the alleged money laundering and carbon credit fraud conspiracy by June 5, 2014 and that as a result, the conspiracy counts are time barred. As supported by an affidavit from Hooper, Hooper's brief describes in detail that Hooper withdrew from the conspiracy, communicated his withdrawal to Ralston and Wright, and did not receive any benefit from or take any further acts in furtherance of the conspiracy after his withdrawal. ECF No. 190-1 at 8-17. Hooper argues that the question of his withdrawal from the conspiracy is a question of law that can be determined by the Court before trial; Hooper argues that the Court should thus either find that the prosecution of the conspiracy counts is barred by the statute of limitations (based on finding that Hooper had withdrawn from the conspiracy by June 5, 2014), or, if the Government disagrees with the facts set out by Hooper, grant an evidentiary hearing on the issue.

The Court has authority to consider and grant a motion to dismiss at the pretrial stage, including on a defense "that the court can determine without a trial of the general issue." Fed R. Crim. P. 12(b)(2). Hooper's entire argument rests on finding that his statute of limitations defense can be determined without a trial of the general issue and can be appropriately resolved before trial. However, Hooper's sole support for his assertion is an Eighth Circuit case that stands for a narrower proposition: that

-18-

if there are no disputes of fact, a court may decide before trial whether withdrawal bars prosecution. See United States v. Grimmett, 150 F.3d 958, 961 (8th Cir. 1998). In Grimmett, the facts were uncontested on appeal that the defendant, who was charged with participation in a narcotics conspiracy, had made a confession to law enforcement that she argued constituted a complete withdrawal before the limitations period began running. Id. at 959-60. It was not clear to the Eighth Circuit from the trial court record whether there was a factual dispute regarding the defendant's alleged withdrawal, and the Eighth Circuit thus remanded for further proceedings while making clear that resolution of significant factual issues would need to be deferred until trial. Id. at 962. In any event, the Second Circuit requires the resolution of significant factual issues at trial: where a defense, including a statute of limitations defense, "raises dispositive evidentiary questions, a district court must defer resolving those questions until trial." United States v. Sampson, 898 F.3d 270, 280-81 (2d Cir. 2018).

The Government argues that Hooper's withdrawal defense necessarily involves factual disputes that turn at least in part on determinations of whether to credit Hooper's account, which the Government argues cannot be done without considering the full context of the Government's evidence against Hooper. For example,

Hooper asserts that he communicated withdrawal to Ralston by sending him templates and records that Hooper maintained for the business, ECF No. 190-1 at 10; the Government disputes that these acts constitute withdrawal because they instead furthered the alleged scheme by giving Ralston the tools to continue the fraud.

The Government alleges that Hooper took several actions after June 25, 2014, (in July and August 2014), related to obtaining the frozen fraud proceeds, receiving the funds after they were released by Barclays, and transferring the funds to his other accounts; these included emails Hooper sent in or about July 2014 in response to Barclays' inquiries in order to obtain frozen fraud proceeds and Hooper's transfer of fraud proceeds out of Barclays the day the funds were unfrozen. ECF No. 186 ¶¶ 14-16. While Hooper frames this as a question of whether the liquidator (who interfaced with Barclays to wind down CO2 Commodities) was acting as Hooper's agent, this is not simply a question of law about whether the liquidator's actions should be imputed to Hooper, but instead requires considering actions actually taken by Hooper himself. This, in turn, requires determining whether Hooper knew that the funds were fraud proceeds and whether he intended to obtain them, both questions of mens rea that cannot be decided on a motion to dismiss. See, e.g., Sampson, 898 F.3d at 281 ("But when a defense raises a factual dispute that is inextricably intertwined with a

defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion."). Hooper's knowledge of the fraudulent nature of the funds in the $CO_2$ Commodities account, and the conspiracy to defraud that generated those funds and put them in that account, go to the Government's case-in-chief and call into question the credibility of Hooper's assertions that he withdrew from the conspiracy.

Because the facts of Hooper's alleged withdrawal are thus intertwined with the facts surrounding his commission of the alleged offenses, separating the two such that any pretrial adjudication of Hooper's withdrawal defense would be possible cannot be done without considering the full context of the Government's evidence against Hooper. Because Hooper's withdrawal defense inevitably implicates disputed facts related to the actual alleged offense conduct, the Court will not resolve Hooper's withdrawal defense without a trial on the merits. See Sampson, 898 F.3d at 279, 280-81. Accordingly, and as set out in the Court's bottom-line order dated March 4, 2022, Hooper's motion to dismiss Counts One and Three of the S2 Superseding Indictment on the ground that he withdrew from the charged wire fraud and money laundering conspiracies before the applicable statute of limitations period is denied, as is Hooper's request for an evidentiary hearing.

## V.   Motion to Dismiss Count One as Duplicitous

Hooper also moves to dismiss Count One as duplicitous because it joins two separate conspiracies into one continuous scheme when Hooper is only alleged to be part of one conspiracy, the carbon credit fraud. An indictment is impermissibly duplicitous if (a) it combines two or more distinct crimes in one count in contravention of Rule 8(a) of the Federal Rules of Criminal Procedure and (b) the defendant is thereby prejudiced. Vilar, 729 F.3d at 79; United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001). Acts that "could be characterized as part of a single continuing scheme" may be charged in a single count without being duplicitous. Vilar, 729 F.3d at 79. When the charge is conspiracy, an indictment is not duplicitous simply because it alleges that the conspiracy had multiple objects, and "[a]s long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989). A defendant may be prejudiced where a defendant potentially lacks notice of the crime charged and its maximum penalty, a second trial on the same offense would potentially not be barred by the Double Jeopardy Clause, or there is potential uncertainty with respect to the crime of which the jury convicted the defendant and the attendant sentencing implications. Sturdivant, 244 F.3d at 77-78.

As detailed above, Count One of the S2 Indictment alleges that the investment fraud scheme had two parts: the stock fraud and the carbon credit fraud. Hooper is only alleged to be involved in the carbon credit fraud, not the stock fraud. Hooper argues that these are not two parts of one scheme, but rather two separate conspiracies, asserting that the indictment includes only conclusory allegations that the stock fraud and carbon credit fraud were related or otherwise unified, and that the stock fraud conspiracy ended before the carbon credit fraud conspiracy began as a result of an entirely distinct agreement between Ralston, Wright, and Hooper. Hooper argues that to prove a single conspiracy, the Government must show that each alleged member agreed to participate in a collective venture directed toward a common goal, see United States v. Martino, 664 F.2d 860, 876 (2d Cir. 1981), and that Hooper did not agree to participate in any alleged conspiracy relating to the sale of the DirectView stock beginning in or around 2009.

The Government responds that both the stock fraud and carbon credit fraud were part of a single continuing scheme to defraud investors, and that the fact that the investment product fraudulently sold to victims changed during the course of the investment fraud scheme does not make Count One duplicitous. The Government further argues that it does not matter that Hooper is

only alleged to have participated in the carbon credit fraud because "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989).

The change in the specific fraudulent investment vehicle is not enough to render the stock fraud and carbon credit fraud into two separate conspiracies; the consistent means and methods of the scheme throughout render Count One a single, continuing scheme such that Count One is not impermissibly duplicitous. See Tutino, 883 F.2d at 1141. Neither does Hooper raise concerns about prejudice that cannot be addressed by appropriate jury instruction: Hooper argues that he would be prejudiced by the duplicity of Count One because the inclusion of the stock fraud communicates to the jury that Hooper had been participating in a long-standing conspiracy that spanned nearly fifteen years and improperly suggests that Hooper was participating in multifarious schemes. There would not be any cognizable prejudice because Hooper is on notice of the crime with which he is charged and its maximum penalty (which is not affected by the fact that the stock fraud is part of Count One). Sturdivant, 244 F.3d at 77–78. The jury can be instructed, if appropriate, that Hooper is alleged to have participated in the carbon credit fraud but not the stock fraud.

-24-

Accordingly, and as set out in the Court's bottom-line order, Hooper's motion to dismiss Count One as duplicitous because it joins two separate conspiracies into one continuous scheme is denied.

## VI. Motion to Sever Wright's and Ralston's Trial From Hooper's

Wright and Ralston move to sever their trial from that of Hooper, who was actively cooperating with the Government for eight months.[3] A district court may sever defendants' trials if consolidation for trial "appears to prejudice a defendant." Fed. R. Crim. P. 14(a). Motions to sever are within a district court's discretion, though a court should grant a severance under Rule 14 "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993).

To prevail on their motion, Ralston and Wright must demonstrate "substantial prejudice," which can include where a co-defendant's wrongdoing could erroneously cause the jury to

---

[3]    Hooper expressed interest in cooperating with the Government after his arrest in the U.K. in January 2021; more specifically, Hooper proffered with the Government seven times between May and August 2021. In October 2021, the Government extended a cooperation agreement to Hooper, but the scheduled plea hearing was adjourned. In late December 2021, Hooper elected to proceed to trial.

conclude a defendant is guilty, or where there exists probative evidence of a defendant's culpability that is only admissible against a co-defendant when multiple defendants are tried together with varying degrees of guilt. See United States v. Werner, 620 F.2d 922, 928 (2d Cir. 1980). Wright and Ralston argue that allowing the Government to introduce the eight months' worth of notes and reports from Hooper's proffer sessions would violate Ralston's and Wright's Sixth Amendment Confrontation Clause rights. The Confrontation Clause "prohibits the introduction of the confession of a non-testifying codefendant that implicates the defendant in a crime." United States v. Lung Fong Chen, 393 F.3d 139, 148 (2d Cir. 2004) (citing United States v. Bruton, 391 U.S. 123, 126 (1968)). Wright and Ralston further argue that it is not possible to redact such copious records and that a limiting instruction is not an effective remedy.

In considering the motion to sever, the Court also considers judicial resources. See United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986) (noting that the question under Rule 14 is whether that prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials"). Given the intertwined nature of the evidence against the three defendants, severance would effectively require the Government to present the evidence of the same complex fraud

scheme twice, before two different juries, which would likely place a burden on elderly overseas victim witnesses forced to travel to the U.S. for two trials in the midst of the pandemic, and further delay bringing some defendants to trial.

Nonetheless, Wright and Ralston identify a possible Bruton problem if Hooper does not testify at trial and the Government seeks to introduce Hooper's proffer statements. While it may be possible to address a Bruton problem, if it arises, by replacing references to Wright or Ralston with neutral pronouns or words and by providing the jury with a limiting instruction,[4] the Government

---

[4]   Post-Bruton cases clarify that appropriate modifications to a non-testifying co-defendant's confession, coupled with limiting instructions, may satisfy the Confrontation Clause, including where a confession is redacted to eliminate not simply a defendant's name, "but any reference to his or her existence." Richardson v. Marsh, 481 U.S. 200, 211 (1987). The Second Circuit has held that "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's Bruton rights." Tutino, 883 F.2d at 1135; see also United States v. Jass, 569 F.3d 47, 55 (2d Cir. 2009); United States v. Kyles, 40 F.3d 519, 526 (2d Cir. 1991); United States v. Williams, 936 F.2d 698, 701 (2d Cir. 1991); United States v. Benitez, 920 F.2d 1080, 1087-88 (2d Cir. 1990). Simply replacing a defendant's name with a blank space or the word "deleted," however, is not adequate to avoid Confrontation Clause concerns articulated in Bruton. See Gray v. Maryland, 523 U.S. 185, 188 (1998). The Second Circuit has explicitly considered and rejected the argument that Gray generally overruled the Tutino line of precedents, and has reaffirmed that substituting neutral pronouns can address Bruton Confrontation Clause concerns. See Jass, 569 F.3d at 57-58.

was unable at oral argument to provide any specific examples of statements they might use and how such statements could be appropriately redacted and neutralized to address a <u>Bruton</u> problem.

As set out in the Court's bottom-line order, Wright's and Ralston's motions for severance are denied without prejudice to renew. Given the <u>Bruton</u> problem identified by counsel, the Government, if it intends to potentially use any of the statements that create a possible <u>Bruton</u> problem, must, one month in advance of trial, provide to the Court three typical examples of statements at issue that it intends to offer, so that the Court can determine whether they and other such statements can be neutralized and redacted in such a way as to avoid any <u>Bruton</u> problem.

## VII.    Motion for Supplemental Bill of Particulars

Hooper initially requested a bill of particulars setting forth details regarding (a) the bank fraud conspiracy object added in the S2 Indictment, (b) the allegations pertaining to C02 Commodities, and (c) all acts by Hooper after January 2014 in furtherance of the charges. ECF No. 190-1 at 31–32. At oral argument, counsel for Hooper stated that the Government's submission had mooted his motion for a supplemental bill of

particulars; as such, and as stated in the Court's bottom-line order, this motion is dismissed without prejudice.

**VIII.    Motion to Find Government's 404(b) Notice Insufficient**

As stated in the Court's bottom-line order dated March 4, 2022, Ralston's motion to find the Government's 404(b) notice insufficient is denied without prejudice. In its brief and at oral argument, the Government stated that it would be issuing new 404(b) notices to all three defendants. See ECF No. 197 at 50. The Government is directed to provide its new 404(b) notice to all parties one month in advance of trial.

**CONCLUSION**

For the aforementioned reasons, the Court, as set out in the bottom-line order dated March 4, 2022, hereby denies, on various grounds, the defendants' pretrial motions. The resolution of these motions does not preclude appropriate motions in limine on the schedule outlined in the Court's Individual Rules. The Clerk is directed to close the entries at docket numbers 190 and 191.

SO ORDERED.

Dated:    New York, NY
          March 14, 2022

_____
JED S. RAKOFF, U.S.D.J.